1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DAVID RUCKER,

11            Petitioner,                    No. CIV S-03-1715 LKK EFB P

12        vs.

13   JIM HAMLET, Warden,

14            Respondent.              FINDINGS & RECOMMENDATIONS

15   _____/

16        Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 1999 judgment of

18   conviction entered against him in Sacramento County Superior Court on charges of driving

19   under the influence of alcohol; driving with a blood alcohol level of .08% or greater, with an

20   enhancement for driving with a blood alcohol level of .20 or higher; and misdemeanor hit-and-

21   run while driving on the wrong side of the road.  He seeks relief on the grounds that: (1) his

22   sentence constitutes cruel and unusual punishment; (2) his appellate attorney rendered

23   ineffective assistance; and (3) his right to due process was violated by the giving of a jury

24   instruction.  Upon careful consideration of the record and the applicable law, the undersigned

25   recommends that petitioner's application for habeas corpus relief be denied.

26   /////

1

I.      **Procedural Background**

By information filed September 4, 1998, petitioner was charged with driving under the influence of an alcoholic beverage or any drug, in violation of California Vehicle Code § 23152(a) (count one); driving with a blood alcohol level of .08 percent, in violation of California Vehicle Code § 23152(b) (count two); driving with a suspended license, a misdemeanor violation of California Vehicle Code § 14601.2(a) (count three); and causing an accident by driving on the wrong side of the highway and failing to stop and report the accident, a misdemeanor violation of California Vehicle Code § 20002(a) (count four).  Clerk's Transcript on Appeal (CT) at 7-11.  It was also alleged, as to counts one and two, that petitioner had suffered three prior convictions for driving under the influence; that petitioner had a blood alcohol level of 0.20 percent or more; and that petitioner had suffered three prior serious felony convictions.  *Id.*  It was alleged as to all counts that petitioner had suffered three prior serious felony convictions within the meaning of California's Three Strikes Law.  *Id.*

Prior to trial, count three was severed and count four was renumbered as count three.  *Id.* at 85, 123; Reporter's Transcript on Appeal (RT) at 588.  After a jury trial, petitioner was convicted of counts one, two, and three.  CT at 131-33.  The trial court dismissed the severed count of driving with a suspended license and found the prior conviction allegations to be true.  CT at 6, 133; RT at 611.  On February 26, 1999, petitioner was sentenced to state prison for twenty-five years to life.  CT at 180.

On January 25, 2000, petitioner filed an appeal of his conviction.  Answer, Ex. B. Therein, he claimed that the trial court erred by instructing the jurors with CALJIC No. 17.41.1. *Id.*  The California Court of Appeal affirmed petitioner's judgment of conviction in a reasoned decision dated March 20, 2001.  Answer, Ex. E.  On May 9, 2001, petitioner filed a petition for review in the California Supreme Court.  Answer, Ex. F.  That petition was summarily denied by order dated June 13, 2001.  Answer, Ex. G.  On March 20, 2002, petitioner filed a petition for /////

writ of certiorari in the United States Supreme Court.  Answer, Ex. H.  That petition was denied by order dated May 13, 2002.  Answer, Ex. I.

On October 29, 2002, petitioner filed a petition for writ of habeas corpus in the Sacramento County Superior Court.  Answer, Ex. J.  Therein, he claimed that his sentence constituted cruel and unusual punishment.  *Id.*  That petition was denied as untimely and on the merits.  Answer, Ex. K.  On December 2, 2002, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, in which he claimed that his sentence constituted cruel and unusual punishment and that his appellate attorney rendered ineffective assistance.  Answer, Ex. L.  That petition was summarily denied by order dated December 5, 2002.  Answer, Ex. M. On December 17, 2002, petitioner raised the same claims in a petition for writ of habeas corpus filed in the California Supreme Court.  Answer, Ex. N.  That petition was summarily denied by order dated July 16, 2003.  Answer, Ex. O.

Petitioner filed the instant petition for a writ of habeas corpus on August 14, 2003.

**II.   Factual Background**

On May 25, 1998, Michael Freas lived at 4813 Monet Way in Sacramento County.  RT at 83.  At approximately 3:55 a.m., Mr. Freas heard a loud crash in front of his house.  *Id.* at 86. He jumped out of bed and ran out of the house to see what had happened.  *Id.*  He saw that his three-quarter ton pickup truck was in the middle of the street with a Chevy S-10 Blazer "plowed into the side of it."  *Id.* at 87.  He approached the Blazer and helped petitioner exit from the passenger side door.  *Id.* at 90, 93-94.  The Blazer smelled of vomit and alcohol.  *Id.* at 95. When Mr. Freas first saw petitioner, he was coming across the console between the driver's seat and the passenger's seat.  *Id.* at 93.  Petitioner was "incoherent to his surroundings and what had happened."  *Id.* at 94.  He stood for approximately 30 seconds and then "staggered" down the street without saying anything to Mr. Freas.  *Id.* at 95-96.  Freas yelled at petitioner that he had just hit his truck.  *Id.* at 95.  He then went back into his house and called 911.  *Id.* at 96.  Mr. Freas did not see anyone other than petitioner on the street.  *Id.* at 98.

3

1    Claudia Delchiaro, a neighbor of Mr. Freas, was awakened by a loud crash. *Id.* at 139.

2 She went outside and saw that a vehicle had crashed into Mr. Freas' truck. *Id.* at 140. She did

3 not see anyone in the vicinity. *Id.* Ms. Delchiaro went back into her house and called 911. *Id.* at

4 140-41. She then went back outside to see if anyone was hurt. *Id.* at 142. She observed that the

5 driver's side door of the Blazer couldn't open because it was too close to the truck. *Id.* at 144.

6 She went around to the passenger's side door and opened it. *Id.* She noticed a smell of alcoholic

7 vomit. *Id.* There was vomit "all over the driver's side door on the window, on the steering

8 wheel and even into the dashboard, and all over the floor of the driver's side." *Id.* at 145. There

9 was no vomit on the console or the passenger seat. *Id.* at 159.

10    Several officers from the highway patrol and the sheriff's department went to the scene

11 of the accident. *Id.* at 165-66, 195, 198, 447-48. Officer Walker testified that there was less than

12 two inches between the driver's door of the Blazer and the bed of the pickup truck, and that it

13 would not have been possible for a person to exit the vehicle from the driver's side. *Id.* at 176-

14 77.

15    The registered owner of the Blazer was Kimyette Rucker. *Id.* at 199. Officers went to

16 her residence. *Id.* Petitioner was asleep on the bed. *Id.* at 199-200. The officers woke

17 petitioner up and noticed that he smelled of alcohol, had red and glassy eyes, and "slurred and

18 mumbled and thick tongue speech." *Id.* at 200. Petitioner had a blood alcohol level of .22 at

19 5:43 a.m. and .21 at 5:57 a.m. *Id.* at 223. Petitioner had an unsatisfactory performance on one

20 field sobriety test and stated that he could not complete three others. *Id.* at 202. Petitioner was

21 then arrested, taken to jail, and placed in a cell with a telephone. *Id.* at 177-78, 181-82.

22 Petitioner informed the officers that he was not the driver of the vehicle. *Id.* at 209. He stated

23 that he had been drinking since the night before, and that Allison Ruiz had dropped him off at his

24 home before the accident occurred. *Id.* at 209-10.

25    Officer Michael Ketterer contacted Allison Ruiz at approximately 6:35 a.m. *Id.* at 210.

26 ////

4

He told her that he was investigating an accident involving petitioner.  *Id.* at 211.  She stated that she and petitioner had been together the evening before and that they had each gone home in separate vehicles.  *Id.* at 211-13.  Officer Walker overheard the conversation between Officer Ketterer and Ms. Ruiz.  *Id.* at 180.  He told petitioner that another officer was talking with Ms. Ruiz on the telephone and that petitioner's story did not "jibe" with what Ms. Ruiz was saying. *Id.*  Subsequently, Ms. Ruiz interrupted her call with Officer Ketterer.  *Id.* at 213-14.  When she came back on the line, she was "uncooperative" and refused to answer questions.  *Id.* at 216. Officer Ketterer asked her if she had been talking with petitioner.  *Id.* at 216-17.  She did not respond.  *Id.*

    At petitioner's trial, Ms. Ruiz testified that petitioner was her boyfriend.  *Id.* at 359-60. She stated that on the day preceding the accident, she and petitioner were drinking and visiting various people, including petitioner's sister.  *Id.* at 366-67, 369-74.  Sometime between 3:00 and 4:00 a.m., she and petitioner left in the Blazer to go back to the home of petitioner's wife.  *Id.* at 374, 376.  Ruiz was driving.  *Id.* at 376.  While they were driving, petitioner leaned toward Ruiz and vomited.  *Id.*  At that same moment, she hit the truck.  *Id.* at 377, 378-79.  Petitioner told her to leave, so she got out of the car on the driver's side and ran off.  *Id.* at 382-83, 384-89, 395. From a nearby mall, she called her friend FeOrriah Jones, who picked her up and took her home. *Id.* at 396-401.

    Ms. Ruiz also testified that during her conversation with Officer Ketterer, she put him on hold to take a call from petitioner.  *Id.* at 408, 410.  A tape of the telephone conversation between Ms. Ruiz and petitioner was played to petitioner's jury.  *Id.* at 417.  During the conversation, petitioner told Ruiz several times that she "drove [him] over there."  *Id.*  When Ruiz asked petitioner why the police were calling her, he responded "Cause I said you – you're the one that brought me home."  *Id.*

    FeOrriah Jones testified for the defense.  *Id.* at 290.  She stated that she was with petitioner, Ms. Ruiz, and a group of their friends the evening preceding the accident.  *Id.* at 291.

1   Everyone was drinking.  *Id.*  Ms. Jones left sometime between 2:00 and 3:00 a.m.  *Id.*  At some

2   point before dawn, Ms. Ruiz paged her and asked for a ride home.  *Id.* at 292.  Jones picked up

3   Ruiz and took her home.  *Id.* at 292-93.  Ms. Ruiz was "raggedy" and smelled of vomit.  *Id.*

4        Carolyn Howard, petitioner's sister, also testified for the defense.  *Id.* at 461.  She stated

5   that when Ms. Ruiz and petitioner left her house at 4:00 a.m., Ruiz was driving the Blazer.  *Id.* at

6   462-63.

7   **III.    Analysis**

8        **A.  Standards for a Writ of Habeas Corpus**

9        Federal habeas corpus relief is not available for any claim decided on the merits in state

10  court proceedings unless the state court's adjudication of the claim:

11              (1) resulted in a decision that was contrary to, or involved an
                unreasonable application of, clearly established Federal law, as
12              determined by the Supreme Court of the United States; or

13              (2) resulted in a decision that was based on an unreasonable
                determination of the facts in light of the evidence presented in the
14              State court proceeding.

15  28 U.S.C. § 2254(d).

16       Under section 2254(d)(1), a state court decision is "contrary to" clearly established

17  United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law

18  set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially

19  indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different

20  result.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406

21  (2000)).

22       Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas

23  court may grant the writ if the state court identifies the correct governing legal principle from the

24  Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

25  case.  *Williams*, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

26  that court concludes in its independent judgment that the relevant state-court decision applied

6

clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

## B.  Petitioner's Claims

### 1.  Cruel and Unusual Punishment

Petitioner contends that his sentence of twenty-five years to life under California's Three Strikes law constitutes cruel and unusual punishment.  Petitioner raised this claim for the first time in his petition for a writ of habeas corpus filed in the California Superior Court.  The Superior Court rejected this argument on the merits and on the ground that the petition was untimely filed pursuant to *In re Clark*, 5 Cal.4th 750, 774-75 (1993).  With respect to its decision on the merits of petitioner's claim, the court reasoned as follows:

> Nor do the recent Ninth Circuit decisions remove the Clark bar to the claim.  Neither Andrade nor Brown need be followed at this time, as they are not binding on this court (People v. Bradley (1969) 1 Cal.3d 80, 86; see also Etcheverry v. Tri-Ag Service, Inc. (2000) 22 Cal.4th 320, 321 [reaffirming Bradley rule]).  Indeed, Andrade has been granted certiorari by the United States Supreme Court.  Until the United States Supreme Court concludes otherwise, this court is bound under Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, to reach the opposite conclusion than that reached in Andrade and Brown, as the Fourth District Court of Appeal, Division One (People v. Mantanez (2002) 98 Cal.App.4th 354) and the Fourth District, Division Two (People v. Romero (2002) 99 Cal.App.4th 1418) have both specifically rejected Andrade and Brown and upheld California's "Three Strikes" law against just such a cruel and unusual punishment attack.

Nor does petitioner, in any event, demonstrate that the facts in his case are exactly that of the defendants in <u>Andrade</u> or <u>Brown</u>, which involved current offenses of petty theft with a prior.  Petitioner, in contrast, was convicted of felony driving under the influence, having been previously convicted three times of driving under the influence offenses.  That is qualitatively different, as human lives are endangered by drunk drivers on the road, a much more serious and threatening problem to society than mere petty theft.  And, by the time it has become a <u>fourth violation</u>, it is clearly a <u>significant recidivism problem</u>.

Nor does petitioner bear any similarity to the defendants in <u>Andrade</u> and <u>Brown</u> with regard to his past criminal history, which includes prior convictions of rape, conspiracy, and spousal abuse. <u>Andrade</u> and <u>Brown</u> purportedly had no history of violence against other persons.

Thus, even if <u>Andrade</u> and <u>Brown</u> were to be controlling new law, which neither is, petitioner would not be entitled to relief under either, even if the claim were not barred by <u>Clark</u>.

Answer, Ex. K.

In *Lockyer v. Andrade*, 538 U.S. 63 (2003), the United States Supreme Court found that in addressing an Eighth Amendment challenge to a prison sentence, the "only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear and applicable only in the 'exceedingly rare' and 'extreme' case."  *Id.* at 73 (*citing Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991); *Solem v. Helm*, 463 U.S. 277, 290 (1983); and *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)).  *See also Taylor v. Lewis*, 460 F.3d 1093, 1097 (9th Cir. 2006). The Supreme Court in *Andrade* concluded that two consecutive twenty-five years to life sentences with the possibility of parole, imposed under California's Three Strikes law following two petty theft convictions with priors, did not amount to cruel and unusual punishment.  538 U.S. at 77; *see also Ewing v. California*, 538 U.S. 11 (2003) (holding that a sentence of twenty-five years to life imposed for felony grand theft under California's Three Strikes law did not violate the Eighth Amendment).

////

8

1    Following the decision in *Andrade*, the United States Court of Appeals for the Ninth

2    Circuit held that a third strike sentence of twenty-five years to life in prison for a third

3    shoplifting offense, a "wobbler" under state law, constituted cruel and unusual punishment.

4    *Ramirez v. Castro*, 365 F.3d 755 (9th Cir. 2004).[1]  In so holding, the court relied upon the

5    limited and non-violent nature of the petitioner's prior criminal history and the fact that the

6    petitioner's only prior period of incarceration had been a single one-year jail sentence.  *Id.* at

7    768-69.  Thereafter, in *Rios v. Garcia*, 390 F.3d 1082 (9th Cir. 2004), the court distinguished the

8    holding in *Ramirez* from the situation it confronted, finding that the petitioner in *Rios* had a

9    "lengthy criminal history," had "been incarcerated several times," and that the prior strikes used

10   to enhance the petitioner's sentence had "involved the threat of violence."  *Id.* at 1086.

11   This court finds that in this case petitioner's sentence does not fall within the type of

12   "exceedingly rare" circumstance that would support a finding that his sentence violates the

13   Eighth Amendment.  As noted by the California Superior Court, petitioner's current offense of

14   conviction involved a high degree of danger to other persons and was the fourth such conviction.

15   Petitioner had also suffered prior convictions for violent crimes, including rape and spousal

16   abuse.  *See* Reporter's Transcript of Judgment and Sentence at 13-14.  In addition, petitioner

17   apparently served a prior prison sentence in the California Youth Authority.  Answer, Ex. N at 3.

18   Under these circumstances, the state courts' rejection of petitioner's Eighth Amendment claim

19   was neither contrary to, nor an unreasonable application of clearly established federal law.  This

20   claim for relief must therefore be denied.

21              ## 2. Ineffective Assistance of Appellate Counsel

22   Petitioner's next claim is that he received ineffective assistance of appellate counsel.

23   Petitioner informs the court that he suggested to appellate counsel several claims that should be

24   raised on appeal, such as a claim that his sentence constitutes cruel and unusual punishment.

25
26       [1]  A "wobbler" is an offense that can be punished as either a misdemeanor or a felony
     under applicable law.  *See Ferreira v. Ashcroft*, 382 F.3d 1045, 1051 (9th Cir. 2004).

1   Pet. at 5, 9.   Counsel responded to petitioner's suggestions in a letter, in which she explained

2   why she decided not to raise each of petitioner's suggested issues.  *Id.* at 25.  Counsel explained

3   that, "in [her] professional judgment," the claim she raised in the opening brief "raises the only

4   appealable issue present in your case."  *Id.*

5        The Sixth Amendment guarantees the effective assistance of counsel.  The United States

6   Supreme Court set forth the test for demonstrating ineffective assistance of counsel in *Strickland*

7   *v. Washington*, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of counsel, a

8   petitioner must first show that, considering all the circumstances, counsel's performance fell

9   below an objective standard of reasonableness.  *See, Strickland*, 466 U.S. at  687-88.  After a

10  petitioner identifies the acts or omissions that are alleged not to have been the result of

11  reasonable professional judgment, the court must determine whether, in light of all the

12  circumstances, the identified acts or omissions were outside the wide range of professionally

13  competent assistance.  *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  Second, a

14  petitioner must establish that he was prejudiced by counsel's deficient performance.  *Strickland*,

15  466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for

16  counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at

17  694.  A reasonable probability is "a probability sufficient to undermine confidence in the

18  outcome."  *Id.  See also Williams*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981

19  (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was

20  deficient before examining the prejudice suffered by the defendant as a result of the alleged

21  deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

22  sufficient prejudice . . . that course should be followed."  *Pizzuto v. Arave*, 280 F.3d 949, 955

23  (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 697).

24        In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption

25  that counsel's performance falls within the 'wide range of professional assistance.'"  *Kimmelman*

26  *v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689).  There is in

1    addition a strong presumption that counsel "exercised acceptable professional judgment in all

2    significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing

3    *Strickland*, 466 U.S. at 689).  However, that deference "is predicated on counsel's performance

4    of sufficient investigation and preparation to make reasonably informed, reasonably sound

5    judgments." *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc).

6         The *Strickland* standards apply to appellate counsel as well as trial counsel.  *Smith v.*

7    *Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).

8    However, an indigent defendant "does not have a constitutional right to compel appointed

9    counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

10   professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751

11   (1983).  Counsel "must be allowed to decide what issues are to be pressed."  *Id.*  Otherwise, the

12   ability of counsel to present the client's case in accord with counsel's professional evaluation

13   would be "seriously undermined."  *Id.  See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th

14   Cir. 1998) (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and

15   is not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

16   meritless arguments on a client's behalf.  *See Strickland*, 466 U.S. at 687-88 (requiring a

17   showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

18   to raise a weak issue.  *See Miller*, 882 F.2d at 1434.  In order to establish prejudice in this

19   context, petitioner must demonstrate that, but for counsel's errors, he probably would have

20   prevailed on appeal.  *Id*. at 1434 n.9.

21        The letter from petitioner's appellate counsel, described above, makes clear that counsel

22   reviewed the trial record and concluded that all of the claims suggested by petitioner, including

23   an Eighth Amendment claim related to the length of his sentence, lacked merit and should not be

24   raised on appeal.  As described above, this court has also concluded that petitioner's Eighth

25   Amendment claim lacks merit.  Appellate counsel's decision to press a claim with arguably more

26   merit than the claims suggested by petitioner was "within the range of competence demanded of

11

1  attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  Further,

2  petitioner has failed to demonstrate that he would have prevailed if his appellate counsel had

3  raised any of his other suggested claims.  He has therefore failed to establish prejudice.

4       The state courts' rejection of petitioner's claim of ineffective assistance of appellate

5  counsel is not contrary to, or an unreasonable application of *Strickland*.  Accordingly, petitioner

6  is not entitled to relief on this claim.

7                    **3.  Jury Instruction Error**

8       Petitioner's jury was instructed with CALJIC No. 17.41.1, which provides as follows:

> The integrity of a trial requires that jurors, at all times during their
> deliberations, conduct themselves as required by these instructions.
> Accordingly, should it occur that any juror refuses to deliberate or
> expresses an intention to disregard the law or to decide the case
> based on [penalty or punishment, or] any [other] improper basis, it
> is the obligation of the other jurors to immediately advise the
> Court of the situation.

13  CT at 117.  Petitioner claims that this jury instruction violated his right to due process because it

14  "impinged upon Petitioner's sixth and fourteenth amendment rights to a unanimous jury and to a

15  jury free to use its power of nullification."  Pet. at 6.  Petitioner contends that the instruction may

16  improperly induce the majority to pressure a holdout minority juror to change his vote or

17  persuade the trial court to dismiss such a juror.  *Id.* at 9-10.  He argues that he "had a right to the

18  verdict of a unanimous jury without any undue pressures from the court.  That right was abridged

19  in this case because the challenged instruction coerced potential holdout jurors into agreeing

20  with the majority."  *Id.* at 9.

21       The California Court of Appeal rejected this claim on the basis that it was waived

22  because petitioner's counsel failed to object to the instruction.  Answer, Ex. E at 3-4.  The

23  appellate court also concluded that the instruction was harmless in any event.  The court

24  explained its reasoning as follows:

> In this case, there was no report that a juror had expressed an
> intention to disregard the law.  Nor is there any suggestion in the
> record that any juror was displeased with the law.  Nor is there

anything about the facts of this case – driving under the influence, which resulted in a Chevrolet Blazer crashing into a parked Ford ranger pickup – that would give rise to a desire to disregard the law.  We note that the trial court ordered that no mention be made that defendant could be sentenced in this case pursuant to the Three Strikes law, and defendant waived his right to have the jury decide whether he had sustained prior convictions within the meaning of the Three Strikes law.  Accordingly, the jury was not aware of the Three Strikes issue, and thus it cannot be argued that a juror might wish to disregard the law on that basis.

In sum, nothing in the record indicates that the verdicts were affected by the giving of CALJIC No. 17.41.1, even assuming that the standard under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705], applies.  (*See People v. Molina, supra*, 82 Cal.App.4th at p. 1335.)

Indeed, the verdicts were reached within a day and a half after deliberations commenced, with no indication of deadlock or holdout jurors.  Specifically, jury deliberations were conducted on January 12 and 13, 1999.  The clerk's minutes of January 12 reflect that jurors began to deliberate at 8:30 a.m., concluded deliberations at 4:30 p.m., and at some point, requested the court reporter to read back the entire testimony of Officer Ketterer, and to read back "anybody's testimony re[garding]: distance between Blazer driver door and Ford.  Focus on driver's door ability to open or not open."  The clerk's minutes of January 13 reflect that the jury began deliberating at 9:00 a.m., and at 1:45 p.m., it requested to review Vehicle Code section 21650 (driving on the wrong side of the road).  At 2:30 p.m., it announced to the court a verdict had been reached, finding defendant guilty on all counts.

We reject as speculation defendant's argument that the instruction had a chilling effect on the jurors' deliberations, given defendant's failure to point to any evidence that would suggest or support any such potential chill.  Defendant's argument that the "instruction coerced potential holdout jurors into agreeing with the majority" is also speculation in light of the absence of any holdout jurors.  And defendant's contention that the instruction erroneously directed the jury "that it must not engage in jury nullification" cannot establish prejudice where there is no evidence of any interest in engaging in nullification.

Accordingly, we find that any error in giving the instruction was harmless beyond a reasonable doubt.  (*Chapman v. California, supra*, 386 U.S. 18 [17 L.Ed.2d 705].)

1   *Id.* at 5-7.[2]

2      Petitioner's claim for relief is foreclosed by the decision of the Ninth Circuit Court of

3   Appeals in *Brewer v. Hall*, 378 F.3d 952, 955-57 (9th Cir. 2004).  In *Brewer*, the Ninth Circuit

4   held that, regardless of the "constitutional merits" of CALJIC No. 17.41.1, habeas corpus relief

5   was unavailable on the identical claim presented by petitioner here because there is "no Supreme

6   Court precedent clearly establishing" that use of this jury instruction violates a defendant's

7   constitutional rights.  *Id.* at 955-56.  Here, as in *Brewer*, petitioner "has pointed to no Supreme

8   Court precedent clearly establishing that CALJIC 17.41.1--either on its face or as applied to the

9   facts of his case--violated his constitutional rights."  *Id.* at 957.  Thus, the state court's rejection

10  of petitioner's jury instruction claim was not contrary to or an unreasonable application of clearly

11  established federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d).

12     Even if the trial court erred in instructing the jury with CALJIC No. 17.41.1, the error

13  was harmless under the circumstances of this case.  *See Brecht v. Abrahamson*, 507 U.S. 619,

14  623 (1993) (holding that a federal court may not grant habeas relief for trial errors without a

15  showing of actual prejudice, defined as a "substantial and injurious effect or influence in

16  determining the jury's verdict").  As noted by the California Court of Appeal, the jury in

17  petitioner's case quickly reached a verdict without apparent difficulty.  There is no evidence that

18  any juror wished to engage in jury nullification or that any juror was a "holdout" for acquittal.

19  There is simply no indication that the giving of CALJIC No. 17.41.1 in this case chilled the

20  jurors' exercise of free speech or prevented free and full deliberations.  Accordingly, petitioner is

21  not entitled to relief on this claim.

22  ////

23

24     [2]  After the state appellate court issued this decision, the California California Supreme
    Court held that CALJIC No. 17.41.1 "does not infringe upon defendant's federal or state
    constitutional right to trial by jury or his state constitutional right to a unanimous verdict."

25  *People v. Engelman*, 28 Cal. 4th 436, 439-40 (2002).  However, using its supervisory authority
    over the lower state courts, the Supreme Court discontinued the use of CALJIC No. 17.41.1

26  because of its "potential" to intrude on jury deliberations.  *Id.* at 440.

1        For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

2   application for a writ of habeas corpus be denied.

3        These findings and recommendations are submitted to the United States District Judge

4   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

5   after being served with these findings and recommendations, any party may file written

6   objections with the court and serve a copy on all parties.  Such a document should be captioned

7   "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

8   within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

9   *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

10  DATED:  April 19, 2007.

11

12                  EDMUND F. BRENNAN

13                  UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26